# EXHIBIT B

TO
PLAINTIFF'S APPLICATION FOR AN
ORDER CONFIRMING ARBITRATION AWARD

(AWARD OF ARBITRATION)

## AMERICAN ARBITRATION ASSOCIATION
### Employment Arbitration Tribunal

In the Matter of the Arbitration between

Re: 51 166 00418 12

    Marija Norusis, Ph.D.,        Claimant

    and

    Revolution Analytics, Inc.,
                    Respondent

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the employment agreement entered into by the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

### Introduction

This case presents a claim for breach of contract brought by Marija Norusis, Ph.D. ("Norusis"), a professional statistician, against Revolution Analytics, Inc. ("Revo" or "Company"), a software development company that employed Norusis during the period of December 14, 2011 to January 31, 2012. At issue are two written agreements between the parties — an Assignment Agreement effective as of December 11, 2011 ("Assignment Agreement"), by which Norusis transferred to the Company her intellectual property rights in three statistics books she had authored, and an Employment Agreement effective December 13, 2011 ("Employment Agreement") that outlined certain terms governing Norusis' employment relationship with the Company (collectively, the "Agreements").

In short, Norusis contends that the Company breached these Agreements by involuntarily terminating her employment before she had an opportunity to convert the books she had assigned

to the Company, thereby depriving her of compensation for conveying the books and rendering employment services. The Company contends that it acted within the plain written terms of the Agreements and therefore no claim for breach can stand.

**Facts**

Notwithstanding their strongly divergent views of what the Agreements permit, the parties largely agree on the chronology of events that brought them to arbitration. In the fall of 2011, Norusis and the Company's Chief Executive Officer, Norman Nie ("Nie"), began corresponding about the possibility of collaborating to make the Company the leading software product in the data analytics field. Norusis and Nie exchanged numerous emails regarding the terms of an engagement. After much back and forth, in early December 2011, Norusis and Nie agreed on the basic contours of a deal: Norusis would irrevocably assign her intellectual property rights in her books to the Company for $200,000 to be paid in installments upon completion of specified milestones, and the Company would hire her on a part-time basis to covert the books, among other things. When Norusis pointed out that the Company could terminate her employment immediately upon securing the assignment (or, as she put it, "Revo can legally turn around and divorce me the day after the ceremony and you get to keep the dowry"), Nie sought to reassure her. In an email dated December 7, 2011, Nie wrote:

> The notion that we would take your books fire you and hire somewhat [sic] else to rewrite them is pretty far fetched. However, what I am willing to agree to, for your ultimate protection in this regard, is that: "except, god forbid for death or disability, you have an 18 month "exclusive right" to convert the material in your books into "Intro to Data analysis for R", plus the help systems as the design emerges between us." We would also agree not to sell your books, as they stand now to any third party, nor otherwise distribute them for profit. In the finally [sic] analysis the system has to rely, in some fundamental way on mutual trust and best efforts.
>
> I have also informed Jeff and David that I am personally taking over the finalizing of our negotiations, SIC whatever we agree upon is definitive and final! The

2

attached are my changes to David Champaign's original memo; and as you will
see I have tried to meet you in the middle while also trying to keep the deal fair
and square for both parties.

The next day, Norusis emailed in response that she was "fine" with Nie's proposal and requested
that the Company "put [her] to work." Nie responded, "Fantastic! Let's get going now & I'll get
the formal paperwork together to exactly match our agreement."

On December 13, 2011, Norusis received the formal paperwork from the Company,
including an offer letter and the Agreements. The offer letter provided for an annual salary of
$145,000 for no more than 28 hours of work per week, with a start date of the following day,
December 14, 2011. The offer letter also contained an at-will statement clarifying that the
Company "is free to conclude its employment relationship with you at any time, with or without
cause, and with or without notice." The offer letter also contained the following integration
language:

> This letter, along with any agreements relating to proprietary rights between you
> and the Company, set forth the terms of your employment with the Company and
> supersede any prior representations or agreements including, but not limited to,
> any representations made during your recruitment, interviews or pre-employment
> negotiations, whether written or oral. This letter, including, but not limited to, its
> at-will employment provision, may not be modified or amended except by a
> written agreement signed by the President of the Company and you.

The accompanying Employment Agreement contained an arbitration provision and
restrictive covenants largely designed to protect the Company's property. In addition, the
Employment Agreement contained a prominent at-will provision stating:

> I understand and acknowledge that my employment with the Company is for no
> specified term and constitutes "at-will" employment. I also understand that any
> representation to the contrary is unauthorized and not valid unless in writing and
> signed by the President or CEO of the Company. Accordingly, I acknowledge
> that my employment relationship may be terminated at any time, with or without
> good cause or for any or no cause, at my option or at the option of the Company,
> with or without notice.

The Employment Agreement also contained an integration clause, as follows:

> This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President or CEO of the Company and me.

The Assignment Agreement provided for assignment of Norusis' three statistics books, effective immediately upon execution of the Agreement, in exchange for payment of $200,000 in installments as follows: $25,000 to be paid within 21 days of execution of the Agreement; $75,000 upon the achievement of certain goals related to the *Guide to Data Analysis*, then scheduled for Q4 2012; $100,000 for the integration of the other two books into the Revo help product suite; and $50,000 at the general release of GUI 2.0 also scheduled for Q4 2012. The Assignment Agreement further provided that acceptance of all materials and payment would be based on review and approval of a committee consisting of Nie and three other named individuals. Like the other two documents, the Assignment Agreement contained an integration clause stating:

> This Agreement and the documents referred to herein, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and merge and supersede all other understandings and agreements, whether oral or written, between or among the parties hereto with respect to the subject matter hereof. This Agreement may be amended only by a written agreement executed by each of the parties hereto.

Pursuant to these Agreements, Norusis began working for the Company on December 14, 2011. The relationship was not to last, however. In mid-January, the Company terminated Nie's employment. Shortly thereafter, effective January 31, 2012, the Company eliminated several jobs including Norusis' position. The Company did not timely tender the initial $25,000

4

installment due under the Assignment Agreement. In June 2012, however, Nie (then acting as a consultant for the Company), requested that Norusis resume her relationship with the Company on the same terms and conditions previously negotiated. Norusis declined and this proceeding ensued.

<u>Position of Complainant</u>

Norusis seeks payment of the $200,000 promised in exchange for assignment of her intellectual property rights in her three books, as set forth in the Assignment Agreement, as well as the balance of the 12-18 months of compensation purportedly guaranteed to her as part of the employment relationship. Norusis acknowledges that she did not meet the milestones set forth in Exhibit B of the Assignment Agreement upon which payment of the installments was conditioned. Still, she argues that the Company improperly deprived her of the ability to meet those milestones and cannot withhold payment based on its own decision to foreclose her ability to comply with the milestones triggering payment.

Norusis further contends that the Company's actions violated the duty of good faith and fair dealing implied in every contract. Norusis argues that neither party anticipated the Company would have the unfettered right to terminate Norusis and deprive her of the opportunity to convert her books and get paid for her irrevocable transfer of the copyright. When Norusis raised this issue in the December 7-8 email exchange with Nie, he called the notion of Norusis' premature termination "far-fetched" and guaranteed her that, absent her death or disability, it would not happen. For the Company to obtain irrevocable title to the copyrights and then avoid paying Norusis the agreed amount by simply cancelling the project does not meet basic standards of decency, Norusis posits.

Norusis also argues that the "at-will" language in the offer letter and Employment Agreement is consistent with her position that the Company guaranteed her employment for so long as it took to convert her books. The at-will provision in both the offer letter and the Employment Agreement contemplate that any representation to the contrary (i.e., limiting the at-will principle) is unauthorized and not valid "unless in writing and signed by the President or CEO of the Company." Norusis claims that she interpreted Nie's email representations that she would have an 18 month employment period in which to convert the documents to fall within this caveat and supersede the at-will provision for that period of time. Alternatively, Nie contends that this exception to the at-will provision, particularly when considered in combination with the payment schedule in the Assignment Agreement, created an ambiguity permitting the Arbitrator to consider parol evidence to discern the parties' true intent. When considered, these extraneous communications reveal the parties' intent to guarantee her employment for a 12-18 month period while she exercised her right to convert her books and meet the milestones for payment under the Assignment Agreement.

Position of Respondent

The Company argues that the Agreements are clear on their face and must be enforced as written. Because the Agreements included an integration clause explicitly precluding consideration of any statements preceding the documents' execution, the parol evidence rule forecloses the Arbitrator from considering any correspondence or discussions between the parties, requiring instead that the Arbitrator limit her analysis to the language within the four corners of the Agreements.

The Company further argues that the Agreements clearly permitted Revo to deal with Norusis as it did. The Company concedes that it owed Norusis the first $25,000 installment,

6

which it attempted to tender to her in June 2012. The Company argues that it otherwise owed Norusis nothing for the assignment of her books because she failed to meet the conditions precedent to payment set forth in Exhibit B to the Assignment Agreement. The Company acknowledges Norusis' argument that Revo cannot invoke the conditions precedent because it deprived Norusis of the opportunity to meet those conditions by discharging her. In response, the Company posits that such reasoning does not apply because it had a contractual right, pursuant to the at-will provision, to terminate Norusis' employment prior to her performance of the prerequisites to payment.

The Company also rejects the notion that Nie's statements to Norusis during their negotiations modified the at-will provision or limited the Company's ability to terminate her before she had converted the books. According to Revo, the language in the at-will and integration clauses in the Agreements permitting modification of contract terms by a written statement of the CEO applied only to statements made after execution of the documents. The Company asserts that the integration language in particular precludes the parties from relying on any prior statements to alter the language of the Agreements. The Company further points out that Norusis, as a sophisticated businessperson represented by counsel, could and should have challenged the written documents if she did not believe they reflected her understanding with Nie.

As the Company contends, its position reflects long-established and important principles of contract interpretation that prevent parties from challenging a clear and integrated agreement with extraneous matters predating execution of the document. Revo's position further protects the employment at will doctrine by allowing employers, and particularly start-up companies that need maximum flexibility, to adjust quickly to changing business conditions. To find in Norusis'

favor would render written agreements meaningless and open a Pandora's Box of irrelevant and contradictory information.

### Arbitrator's Decision

In addressing a matter of contract interpretation, the Arbitrator's primary purpose is to ascertain and give effect to the parties' intent. *Eichengreen v. Rolins, Inc.*, 325 Ill. App. 3d 517, 521 (2001). *See also Pielet v. Pielet*, 942 N.E.2d 606, 635 (Ill. App. 2010) ("When faced with inconsistent or conflicting contractual language, we give effect to the interpretation of that language that best reconciles and harmonizes each provision with the remainder of the contract). Pursuant to the parol evidence rule, the parties' intent should be determined from four corners of the contract itself without the assistance of extrinsic evidence. *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984). Where a contract is ambiguous, however – meaning that it is "capable of being understood in more sense than one" – parol evidence is admissible to explain and determine what the parties intended. *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). This exception permits the Arbitrator to consider preliminary negotiations between the parties to determine the meaning of the contract provisions.

The Arbitrator agrees with Norusis that the Agreements contain an inherent ambiguity, both on their own and when considered as part of a single transaction. With regard to the Assignment Agreement, Paragraph 5 states that Revo "will pay" Norusis compensation of $200,000 for assigning her intellectual property rights to the Company, to be tendered per the payment schedule delineated in Exhibit B. Exhibit B, however, presents more than a payment schedule; it sets forth specific benchmarks Norusis must achieve in her conversion work, as approved by a committee of designated individuals, to receive future payments. The Assignment Agreement does not elucidate what becomes of the payment owed if the benchmarks are not met,

the designated committee does not stand, or any other contingency prevents achievement of the anticipated milestones. This failure to account for whether the payment remains due and owing (as the plain language of Paragraph 5 would suggest it does) if the schedule falls apart, and under what terms, introduces an inherent uncertainty in the Assignment Agreement.

The Employment Agreement contains its own ambiguity, as evidenced by the parties' differing interpretations of the at-will provision in Paragraph 1. The provision specifically states that written representations from the President or CEO of the Company (Nie) may override the at-will doctrine. Norusis testified that she interpreted this language to effectively incorporate her prior correspondence with and assurances from Nie. The Company, on the other hand, interpreted that language, taken in conjunction with the integration clause, to encompass only representations made by the CEO after the effective date of the Agreement. The Arbitrator finds Norusis' reading of the at-will provision to reflect a more logical reading of the Employment Agreement (i.e., the at-will provision does not limit relevant CEO representations to those made only after execution of the Agreement, and the integration clause would not foreclose consideration of CEO representations if Paragraph 1 incorporates them). Regardless, the parties' divergent views on the relevance and significance of the CEO's pre-execution statements reveal an ambiguity that permits consideration of extrinsic evidence.

Reading the Agreements together as part of a single transaction only reinforces the finding of ambiguity in each. On its face, the Employment Agreement permits the Company to terminate Norusis at any time for any reason (unless the CEO has promised otherwise). The Assignment Agreement, on the other hand, clearly contemplates Norusis' ongoing employment with the Company to convert her books – a process estimated to continue into Q4 of 2012.

9

When viewed in tandem, the Agreements create precisely the conundrum the parties find themselves in here, which in turn allows the Arbitrator to consider parol evidence.

The parol evidence – specifically, the email correspondence of December 7-8 reflecting the negotiation – does indeed illuminate the parties' intent with regard to the nature and duration of Norusis' employment. In the email exchange on December 7-8 between Nie (as the authorized agent of Revo) and Norusis, Norusis expressed concern that the Company would secure rights to her books upon signature but then deprive her of the right to convert them (and earn a salary for doing so) by immediately terminating her employment – her "divorce but keep the dowry" scenario. In response, Nie offered Norusis several assurances: (i) that she would have an eighteen month "exclusive right" to convert the books after assignment; (ii) that the "notion we would take your books fire you and hire someone else to rewrite them is pretty far-fetched"; (iii) that the conversion would be part of her job duties for the Company; (iv) that he was "taking over the finalization" negotiations and "whatever we agree upon is definitive and final"; (v) that the formal documents sent to her by the Company would "exactly match our agreement"; (vi) that the arrangement had to be based on "mutual trust and best efforts" and must be "fair and square" for both parties.

Nie's insistence that their negotiations would be "definitive and final" and the documents would "exactly match" his representations to Norusis demonstrate that the at-will and integration clauses should be read to include prior written modifications to the contract language made by the CEO. In turn, these representations – particularly Nie's recognition of Norusis' "exclusive right" to perform the conversion project – establish that the parties intended to modify the at-will provision of the Employment Agreement to grant Norusis the right to handle the conversion, as an employee of the Company, for the ensuing eighteen months. Thus, the parol evidence

supports Norusis' interpretation of the Employment Agreement that she could not be terminated at-will while conversion work remained to be done.

Having established that Revo could not unilaterally terminate Norusis during the conversion period, it becomes clear that Norusis is entitled to full payment under the Assignment Agreement. Paragraph 5 of the Assignment Agreement states that the Company "will pay" Norusis the sum of $200,000, characterizing Exhibit B as a "payment schedule," not a description of conditions precedent to payment. Given that the assignment was effectuated in full upon execution, it makes sense to read Paragraph 5 as requiring payment in full to be vested at that same time. Even if achievement of the milestones were actually conditions precedent to payment (instead of markers to determine the payment date for monies owed), Revo cannot avoid its obligations where it frustrated Norusis' ability to meet the conditions by firing her. *See Cummings v. Beaton & Assoc., Inc.*, 618 N.E.2d 292, 303 (Ill. App. 1992) ("a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting a failure of the condition he himself has rendered impossible). By virtue of its CEO's representations, Revo did not have an unfettered right to terminate the employment relationship, and it cannot exploit its decision to let go of Norusis before she could meet the milestones to justify withholding full payment of the assignment fee.

Notably, this interpretation of the Agreements not only comports with the principles of contract interpretation and parol evidence, it reflects the equities of the situation. The Company repeatedly asserted that the record contains no evidence to suggest that Revo "tricked" or "forced" Norusis to sign the documents tendered to her on December 13. To the contrary, Revo appears to have done precisely that, although perhaps not deliberately. Nie expressly assured Norusis that Revo would not deprive her of the opportunity to handle the conversion after

assigning her books. Nie further promised that the understanding he and Norusis reached would be "definitive and final" and that the "formal paperwork" would "exactly match our agreement." He ended his email imploring her to have faith in their "mutual trust" to reach a deal "fair and square" to both parties. Notwithstanding these representations, Nie apparently turned over responsibility for the documents to Erhardt, who sent Norusis the Agreements on December 13, a mere day before her anticipated start date. For reasons the Company could not explain, the Agreements did not reflect the terms promised by Nie – they made no reference to Norusis' "exclusive right" to convert the documents or otherwise address Norusis' concern about a premature termination that left her without her copyrights or an income stream for converting her books. Moreover, the Company sent urgent instructions for Norusis to sign and return the Agreements immediately, placing her in a position where she felt pressured to act hastily. The Company then deprived Norusis of a $25,000 installment to which she was indisputably entitled.

While the Arbitrator is not persuaded that the disconnect between Nie's unambiguous representations and the lack of clarity in the documents occurred as a premeditated means to deceive Norusis, she also believes the Company's position reflects a lack of good faith. Either the Company was extremely sloppy in its drafting responsibilities or it set out to purposefully mislead Norusis. At the hearing, the Company made no effort to explain which scenario applied, nor did the Company seem particularly concerned that it took such inconsistent positions when dealing with Norusis after explicitly appealing to her sense of "mutual trust." Regardless, it would be fundamentally unfair to allow Revo to dodge the clear import of its CEO's representations to Norusis because the Company failed – either inadvertently or deliberately – to clearly and properly capture those terms in the documents.

12

The Arbitrator also rejects the Company's assertion that a finding for Norusis would make written agreements "meaningless" and open a "Pandora's Box" of irrelevant and contradictory information. This situation contains several exigencies that differentiate it from the "typical" employment at-will contract negotiation. Here, the parties negotiated the Assignment Agreement along with the Employment Agreement, thereby creating an inherent ambiguity in the nature of the parties' relationship. To address concerns emanating from the interplay between the transfer of intellectual property rights and the employment relationship, the CEO made explicit written representations of deal terms that modified the at-will nature of the relationship. The CEO went on to make a direct appeal to "mutual trust" and promise that the documents would "exactly match" the parties' negotiations. Nonetheless, the Company did not revise the documents to reflect the CEO's terms for reasons never explained and perhaps not understood. These circumstances render this situation unique and underscore the reasons for considering parol evidence here.

In sum, the Agreements executed by the parties contained ambiguities regarding the role of the CEO's extraneous written statements and the nature of the parties' at-will employment relationship, which permits the consideration of parol evidence. When such evidence is considered (in the form of emails between Nie and Norusis on December 7-8), it becomes clear that Nie intended his statements to be incorporated into the Agreements, and that those statements modified the at-will relationship to encompass an eighteen month "exclusive right" to employment for the purpose of converting the books. By depriving Norusis of this opportunity and refusing to pay her for the assignment as agreed, the Company breached both the Employment Agreement and the Assignment Agreement.

13

<u>Damages</u>

The finding that Revo breached the Agreements entitles Norusis to damages. The parties agree that Norusis is entitled to the first installment under the Assignment Agreement of $25,000. Beyond that, Revo contends that Norusis is entitled to nothing for assigning her books to the Company, as she failed to meet the delineated milestones and the books are worthless without her conversion work. Norusis contends she is entitled to the full $200,000 regardless of the fact that she did not meet the designated milestones, as Revo prevented her from performing the conversion.

The Arbitrator agrees that Norusis is owed the full $200,000. As an initial matter, Paragraph 5 of the Assignment Agreement states that the Company "will pay" Norusis the sum of $200,000, characterizing Exhibit B as a "payment schedule," not a description of conditions precedent to payment. Given that the assignment was effectuated in full upon execution, it makes sense to read Paragraph 5 as requiring payment in full to be vested at that same time. Even if the achievement of the milestones are regarded as conditions precedent to payment (instead of markers to determine the payment date for monies owed), Revo cannot avoid its obligations where it frustrated Norusis' ability to meet the conditions by firing her. *See Cummings v. Beaton & Assoc., Inc.*, 618 N.E.2d 292, 303 (Ill. App. 1992) ("a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting a failure of the condition he himself has rendered impossible). By virtue of its CEO's representations, Revo did not have an unfettered right to terminate the employment relationship, and it cannot exploit its decision to let go of Norusis before she could meet the milestones to justify withholding full payment of the assignment fee.

14

Norusis' wage claim is less clear cut. Norusis seeks full compensation for the 12-18 month period it was anticipated she would work for the Company converting her books, without any offset or diminishment. The Company argues that no damages are owed because Norusis failed to mitigate her damages by looking for alternate employment and/or accepting its invitation to resume employment in June 2012, just 4.5 months after her separation on January 31, 2012. Norusis responds that she has no obligation to mitigate where Revo unilaterally repudiated their deal.

The Arbitrator finds that Norusis is entitled to back pay totaling $54,600 for the period of time between her termination and June 15, 2012, when Revo attempted to strike a deal with her to complete the conversion work. The Company's invitation to return fell within the 12-18 month time period within which she was to be working for Revo, and Nie represented that the Company might be willing to tweak the prior arrangement to address any concerns Norusis had about resuming her relationship with Revo. Norusis did not testify about any particular impediments to resuming her conversion work at that point. Because Norusis could have cut off her damages as of June 15, 2012, she is not entitled to any compensation after that date.

## Conclusion

For the reasons set forth above, the Arbitrator finds in favor of Marija Norusis, Ph.D., on her claim for breach of contract (based on the Assignment Agreement and Employment Agreement) and awards her the following sums to be paid by Revolution Analytics, Inc.: $200,000 for assignment of her intellectual property rights, plus an additional $54,600 as lost wages for the period of February 1 to June 15, 2012.

The administrative fees and expenses of the American Arbitration Association totaling $5,800.00, shall be borne by Revolution Analytics, Inc. and $300.00 shall be borne by Marija Norusis, Ph.D. The compensation and expenses of the Arbitrator totaling $11,850.00, shall be borne as incurred. Therefore, Revolution Analytics, Inc. shall reimburse Marija Norusis, Ph.D the sum of $5,800.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Marija Norusis, Ph.D.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

| 11/26/12 | | Julie L. Gottshall |
| --- | --- | --- |
| Date | | |

I, Julie L. Gottshall, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

| 11/26/12 | | Julie L. Gottshall |
| --- | --- | --- |
| Date | | |